## ROUNDTREE v. ROUNDTREE.

1. A testator devised certain lands to his widow "for her own use during her natural life, and at her death it is my will and desire that it all shall be equally divided, share and share alike, between my surviving children." *Held*, that the remainder was to the *children* who survived the life-tenant, and not to those surviving at the date of the will or at the death of testator.

2. The intention of a testator, as disclosed by the terms used, and under the rules of law, must govern the construction of a will; and, where the language is obscure, it should be read in the light of the circumstances which surrounded the testator when he wrote his will. But the fact that some of testator's children were deceased at that time, cannot affect the meaning of the word "surviving" in this devise.

3. Nor is this construction affected by the use of the word "surviving" in another clause of the will, to designate, as clearly shown by the context, the children living at the time of testator's death.

4. The devise to the widow was a complete disposition of the property for the time being, the life of the widow. The words "for her own use," refer only to certain personal property mentioned in this clause, and were intended to limit amount and not interest.

5. A son of testator died only a few days before him, leaving children surviving—the testator being then too ill to change his will. *Held*, that

this would not permit the court to let in these grandchildren on the ground of mistake. Can the court correct a mistake in a will? And can it relieve against a mistake of law in any case?

6. The children of the predeceased son of testator could not take by substitution the share which their father would have taken had he survived.

7. The will provided that "if any of my children should die leaving no issue, the property they receive from my estate shall revert back and be equally divided between my surviving children." Here, too, the word "surviving" referred to the death of the first takers.

8. A devise to one for life and then to the children surviving the life-tenant, is a contingent remainder to the children who may then be living.

9. A contingent remainder cannot be levied and sold before the termination of the precedent estate, but may be assigned.

10. Where the person to take under a contingent remainder is ascertained, and only the event is uncertain, the remainder is transmissible; otherwise it is not.

Before COTHRAN, J., Barnwell, March, 1886.

The opinion states the case. The Circuit decree, omitting its statement of the facts, was as follows:

No question seems to have been made as to the widow's personalty given to her for life, if, indeed, any of it has survived the wear and tear of twenty-five years' use and the wreck of Sherman's march through that section in the early part of the year 1865. The real estate, consisting of the home place and the Killingsworth tract, in all some eleven hundred acres, is the subject of contention. In regard to this the following questions arise: 1. Are the children of James, the son who died when his father was *in extremis*, entitled to their father's interest in these lands as in case he had survived the testator? 2. Are the heirs at law of Martha Meyer (her husband and children), she having died after the testator, entitled to a share of this remainder? 3. Who is entitled to the share of Augustus Roundtree—the heirs of James Dicks, the donee under the sheriff's deed, or A. J. Weathersbee, the assignee?

Before entering upon the discussion of these several questions in the order presented, it may be as well to settle, *in limine*, the character and quality of the remainder—whether the same is vested or contingent; for this, it may be premised, affects very

seriously each of the questions proposed.   It goes almost without
saying or the citation of authorities, that the vesting of estates is
favored; the law loves most the attainable, to wit, certainty. By
the first clause of his will the testator gave to his wife certain
negro slaves by name, together with the homestead and the Kil-
lingsworth tract, and as much of the stock, furniture, and planta-
tion tools as she might want for her own use during her natural
life, "and at her death, it is my will and desire that it all shall
be equally divided, share and share alike, between my surviving
children."   The bequest of the slaves and the devise of the lands
to her for life, is a complete disposition of these for the time
being, unaffected by the seeming limitation implied by the terms
"*for her own use*," which manifestly only refers to the amount
and quality of the stock, plantation tools, and furniture which
she might need in operating the farm and keeping up the estab-
lishment as he left it at his death.

The test of a vested interest is that it is made to take effect
upon no other conditions than the possession becoming vacant by
the cessation of title in the person to whom the prior enjoyment
is bequeathed. *Britton* v. *Johnson*, 2 *Hill Ch.*, 431; *Bankhead*
v. *Carlisle*, 1 *Id.*, 358; *Bentley* v. *Long*, 1 *Strob. Eq.*, 43. And
if vested, it is equally clear that such interest is transmissible.
See *Fearne Cont. Rem.*, 534; *McDonald* v. *McMullen*, 2 *Mill
Con. R.*, 91; *Bankhead* v. *Carlisle*, *supra*, a case much in point
as to Mrs. Meyer's heirs. A late case, *McCreary* v. *Burns* (17
*S. C.*, 46), in which the terms of the will vesting the life estate
in the widow, are exceedingly vague and indeterminate, the court
held that the interests of the children were vested at the death of
the testator; and in the case of a daughter Sarah, who had mar-
ried and died before the falling in of the life estate, leaving a
daughter, Alice J., that said daughter Alice succeeded to her
mother's interest, notwithstanding the fact that the division upon
the death of the life tenant was directed by the will, at least im-
pliedly, to be made amongst the testator's children—the very latest
case that I have found and which is referred to here, as well
because of the high source from which it comes as for its striking
analogy to this case, especially in the use of the term "*surviving*."

Confessedly one of the most perplexing in the whole vocabu-

lary of the law is "the Appeal of Baker," decided on 4th January, 1886, and reported at page 337 of vol. 4, No. 5, of the Eastern Reporter, Supreme Court of Pennsylvania. In that case A devised in substance as follows : "When my wife Elizabeth shall be called to her final account, I do further direct that my real estate * * be divided into as many shares as there may be surviving children," &c. It was held that as the word "*surviving*" was synonymous with "*living*," the children took vested remainders. The whole court claimed and emphasized their ruling by holding a subsequent provision of the testator's will to be void, because in its terms it was in derogation of the remainders in fee given by the will to his children. The case is interesting in another aspect of the case in hand, as regards the interest of Augustus Roundtree, in that it holds that there was no conversion of the realty into money by the terms of the will, and the remainder (or reversion, as it is there called) was subject to partition.

Without pursuing this branch of the case further, my conclusion is that the surviving children of William Roundtree, certainly as far back as the time of his death, were entitled to a vested, transmissible interest in the remainder, the possession and use alone being postponed by the preferable right of enjoyment, which the will conferred on the mother, the tenant for life. This conclusion disposes of the question as to the rights of J. J. Meyer and his children, who are entitled under the statute of distribution to the vested, transmissible interest of Martha Meyer, who died after the testator.

The like interest of Augustus Roundtree, being also vested, was subject to levy and sale under execution, before its reduction into possession. *Harrison* v. *Maxwell*, 2 *Nott & McC.*, 347 ; *Bonham* v. *Bishop*, 23 *S. C.*, 96. It was sold and duly conveyed by the deed of the sheriff to the purchaser, Dicks. It is true that the deed was not recorded. Nevertheless, it conveyed the fee, and is good against all the world, except subsequent creditors without notice, who acquired liens before the date of its record. *King* v. *Fraser*, 23 *S. C.*, 543. Or purchasers of like character, who placed their deeds upon record before the prior donee. *McNamee* v. *Huckabee*, 20 *S. C.*, 190.

The defendant, Weathersbee, claims this interest of Augustus

Roundtree in the land in question, under a written assignment from him. He has no deed in the form prescribed by the statute or anything like one. The heirs of Dicks have a deed unquestioned as to form, but it is objected to as not having been recorded until some time after the assignment by Augustus to Weathersbee. Since the date of the assignment the Dicks deed has been recorded. Weathersbee has no deed that can be recorded. If he had a deed in the form of the Dicks deed, and the latter had been recorded and the former not, the Dicks deed would prevail. *Weathersbee v. Huckabee, supra.* This controversy is as to the title to land, one claiming under a legal, the other under an equitable title. Were Weathersbee's weapon as potential as a deed, it could not prevail against the prior recorded deed of the Dicks, and it is difficult to perceive how, with a weapon less potential, he can expect to vanquish his adversary. The legal title of the Dicks must prevail.

This brings us to the consideration of by far the most difficult question in the case: *Are the children of James Roundtree entitled to share in the remainder ?* The answer depends mainly upon the proper construction of the term, "*my surviving children.*" To what period of time shall the fact of survivorship be referred ? The testator has used this expression four times in his will—once as to each of the bequests to his two grandchildren in case they should die without issue ; once as to the distribution of the residue of the estate immediately after his decease ; once as to the distribution of the remainder after the falling in of the widow's life estate.

The fundamental rule in the interpretation of a will is to ascertain the testator's intention by a proper construction of all of its parts, so that, if possible, the will as a whole should stand together. Peculiar indulgence has been extended by the courts to the testator, especially when *inops consilii*, as was the case here, and this has exempted the language of wills from the technical restraints applied to deeds, withdrawing in some degree the former from professional influence. This has been frequently the subject of regret, and by some eminent judges, as far back as Lord Kenyon, as may be seen in his judgment rendered in the case of *Moor* v. *Mellor*, 5 *T. R.*, 561. Such indulgence has

been the prolific source of much uncertainty in the minds of the profession, and consequently of much litigation. Nevertheless, the rule has been maintained with a firm hand by the courts. "Wills and the construction of them," saith Lord Coke, "do more perplex a man than any other learning."

It would be difficult to imagine ever a case with more and better reasons for this indulgence, founded in natural and enlightened justice, in behalf of the children of a favorite son, who died under the circumstances existing here. Such, however, must find sanction in principles of sound construction and in accordance with law. My own convictions of the testator's intention in this regard are so strong that I have given to this branch of the case most diligent consideration, in the hope of effectuating legally the will and desire of the testator. These means of relief have been carefully considered, to wit: 1. Substitution. 2. Mistake. 3. Survivorship at the date of the will.

As to substitution, the rule seems to be that unless the parties so claiming can show their right to substitution by the terms of the will itself, to let them in would be in effect to make a new will for the testator. *Hannam* v. *Sims*, 2 *DeG. & J.*, 151; *In re Chapman's will*, 32 *Beav.*, 382; *In re Woolrich*, 11 *Ch. Div.*, 667. The principle upon which this rule rests appears to be the fact of a primary gift or bequest, in order to include the representatives of a legatee dying in the life-time of the testator. 3 *Jarman*, ch. 49, p. 627 *et seq.* It cannot be shown in this case that the terms of the will embrace the children of James, or that there is in it a primary gift or bequest to them. The other grandchildren, whose parents were dead and who were perhaps not as dear to the testator, were made the objects of his bounty. Not so the children of James.

As to mistake. This is one of the familiar grounds of equity jurisdiction. "In regard to mistakes in wills, there is no doubt that Courts of Equity have jurisdiction to correct them, where they are apparent upon the face of the will, or may be made out by a due construction of its terms, for in cases of wills the intention will prevail over the words." *Story Eq. Jur.*, § 179. Numerous illustrations are given in the text—"My lands in the Manor of Dale," and there were two tracts, &c., and others of

like character, which are familiar. After diligent search, how-
ever, I have found no case similar to the one under consideration.
No doubt, thousands of testators have died in the mistaken belief
that some children then dead were still alive, and such cases are
found in the books; but in every case that I have examined, the
children of the predeceased child were embraced in the primary
gift.

In an Indiana case cited in the note to 3 Jarman, p. 661, the
court refused to admit proof that by a devise to a parent the tes-
tator meant the children of such parent, *who was known by the
testator to be dead at the making of the will.* Such would have
been the ruling here, and perhaps everywhere, for the admission
of such proof would be subversive of one of the universal rules of
evidence. In the case at bar, James was alive at the time the
will was made, and the testator was kept in ignorance of his death
until so near his own that it was probably impossible to alter his
will. The natural order of the testator's affections; the peculiar
circumstances of James's death; the bequest to John B. Round-
tree and Teresa Wood, grandchildren, one of whose parents at
least had been sufficiently advanced in the life-time of the testator;
the distribution of the residue, with the acquiescence of all so as
to include James's children; the consent of all, save one, and he
a son-in-law, to let them in now to share in the remainder, are
reasons quite sufficient to satisfy my mind that it never was the
wish or the will of William Roundtree to exclude the children of
a favorite son from this most reasonable, just, and equitable dis-
tribution of the remainder of his estate.

As to survivorship at the date of the will. "For some pur-
poses a will speaks from the period of execution." 3 *Jarman,*
704. Bearing in mind the fact that at the time of making the
will (1858), five of testator's children, most, if not all, of whom
were grown, had died, it is certainly probable that he used the
term "surviving" as synonymous with "living," and in contra-
distinction to departed or dead. As, for instance, a gift to ser-
vants of the testator, without adding a condition, "that shall be
in my service at the time of my decease," was held to take effect
in favor of the servants at the date of the will, even though they
were not such at the time of his death; and this to the exclusion

of those who subsequently entered his service.    *Parker* v. *Marchant*, 1 *Y. & C. C. C.*, 290.    So, also, in the case of a devise to the wife of A, who has a wife at the date of the will, it relates to that person, and would be unaffected by any change of circumstances rendering the description inapplicable ; but if A have no wife at the date of the will, the gift embraces the person standing in that relation at testator's death.    See *Lloyd* v. *Davies*, 14 *C. B.*, 76, and cases cited ; 3 *Jarman*, chapter XXX., *ad finem*.

It is certainly worthy of remark, that the testator does not say "my children surviving" me, or "my children surviving" either of my grandchildren, or "my children surviving" his widow. Neither of the adverbs of time, "now" nor "then," anywhere appears.    In every instance he says "between my surviving children."    It is unquestionably the rule in South Carolina, that where a testator gives an estate to one for life, with remainder to "*his* children surviving," the words of survivorship must be referred to the period of distribution.    But that is not the case here : the personal pronoun *his* (also italicised above) in such case designates the children of the tenant for life—not the testator's children.    It is a rule of construction that the same words occurring several times in the same instrument have been used each time in the same sense.    *Evans* v. *Godbold*, 6 *Rich. Eq.*, 41.    In the absence of the adverbs, *now* or *then*, it is as reasonable—if not more so—to refer the period of survivorship to the time of making the will as to the testator's death ; and certainly more reasonable to refer it than to the death of the grandchildren or to the death of the widow, who lived more than twenty-five years after these events.

Another rule of construction, and a forceful one, is that courts will seize upon any facts tending to effectuate the testator's intention ; and, after all, every will comes to this, and should.    Again, "the heir is not to be disinherited without an express devise or by necessary implication, importing not natural necessity, but so strong a probability that an intention to the contrary cannot be supposed."    3 *Jarman*, 704, rule V.    The courts will always avow such construction, if possible.    30 *Eng. Ch.*, p. 396, cited and approved in *Evans* v. *Godbold*, *supra*.    "The court will look at the circumstances in which the devisee made his will—as to

the state of his property, of his family, and the like." 3 *Jarman*, 705, rule X.

And in like manner, the statute also helps our infirmity, for "it is a rule, universally adopted in the construction of wills, that whenever there is an unreasonable uncertainty or repugnancy in the disposition made by a testator of his real property, the title of the heir at law shall be preferable to all others, because where a court cannot find words in a will which, either expressly or by necessary implication, denote the testator's intentions beyond the possibility of a doubt, the rules of law regulating the descents, which are certain, must prevail, and cannot be superseded by an uncertain devise." *Powell on Devises*, 348.

Wherefore it is ordered, adjudged, and decreed: 1. That the children of James Roundtree, as a class, be let into the distribution of the remainder. 2. That J. J. Meyer and his children take the share thereof, under the statute of distribution, which vested in the said Martha Meyer at the time of her death. 3. That the heirs at law of James Dicks are entitled to the interest therein which Augustus Roundtree had, which was conveyed by the deed of the sheriff to James Dicks in his life-time. 4. That the costs of this suit be taxed by the clerk of the court and paid out of the general fund.

*Mr. Robert Aldrich*, for A. J. Weathersbee and A. M. Roundtree.

*Mr. G. W. Croft*, for the children of James W. Roundtree.

*Messrs. Henderson Bros.*, for plaintiffs and the Dicks heirs.

*Messrs. Aldrich & Ashley*, for the heirs of Mrs. Meyer.

April 19, 1887.   The opinion of the court was delivered by

MR. JUSTICE McIVER.   Sometime in the year 1860 William Roundtree, late of Barnwell County, in the State aforesaid, departed this life, having previously, to wit, on January 12, 1858, duly made and executed his last will and testament.   At the time the will was executed the testator had a wife and seven children.   He had previously lost four children, two of whom died

childless and unmarried, and the other two having each left one child—one a son and the other a daughter. One of testator's sons, James W. Roundtree, who wrote the will, and who had at the time seven children, which was known to the testator, died about five or six days before his father, leaving eight children, but for prudential reasons the testator was kept in ignorance of his son's death until a very few days before his own death.

By the first clause of his will the testator gave to his wife, Jane Roundtree, certain slaves, together with the tract of land on which he resided, and also the Killingsworth tract, "and as much of the stock, horses, mules, cattle, and hogs and provisions, together with the house furniture and plantation tools, as she may want for her own use during her natural life; and at her death it is my will and desire that it all shall be equally divided, share and share alike, between my surviving children." By the 2d clause he gave to his granddaughter, Teresa Wood, the child of his pre-deceased daughter, a negro girl, with the provision that "should she die leaving no children, the said negro girl, with her increase, if any, to revert back and be equally divided between my surviving children." By the 3d clause he gave to his grandson, John B. Roundtree, a son of his pre-deceased son, a negro boy, with a similar provision, in case of his death without children, to that contained in the next preceding clause.

By the 4th clause he says: "It is my will and desire, immediately after my death, that the whole of the rest, residue, and remainder of my estate, both real and personal, shall be equally divided between my surviving children, share and share alike." By another paragraph of the same clause, he declares it to be his will that his wife, Jane, his granddaughter, Teresa Wood, and his grandson, John B. Roundtree, shall have nothing more than what is given to them respectively in the first, second, and third clauses above written. By another paragraph of the same clause he declares, "finally, it is my will and desire, that if any of my children should die leaving no issue, the property they receive from my estate shall revert back and be equally divided between my surviving children." And after providing that his son, James W. Roundtree, should receive and manage the share

of his son Augustus until he attained the age of twenty-one
years, he, in the last paragraph of the 4th clause, appoints his
executors, and says: "I desire that they shall make the division
of my estate, as written above, which division, when made, shall
be final."

It is stated in the Circuit decree that very soon after the
decease of the testator, the residue of his estate was divided into
seven equal parts, one of which was allotted to the children of
James W. Roundtree, who had pre-deceased the testator by a
very few days; but this fact does not appear in the "agreed state-
ment," upon which the case seems to have been heard.

During the life-time of the testator's widow, to wit, in 1869,
one of the testator's daughters, Martha, who had intermarried
with one Meyer, departed this life, leaving as her heirs at law
her husband and seven children, who are parties plaintiffs in this
action. During the same period, but at what time precisely does
not appear, the interest of Augustus M. Roundtree, in the
remainder of his father's estate, after the termination of the life-
estate of his mother, was sold by the sheriff under execution and
bought by one Dicks, who, having died, his heirs at law are made
parties, claiming the share of said Augustus under the sheriff's
deed, which, however, was not recorded within the time pre-
scribed by law, and not until after the assignment by Augustus
to the defendant, Weathersbee, hereinafter mentioned, was exe-
cuted.

The life-tenant, Mrs. Jane Roundtree, having died some time
in September, 1885, the executors, under the impression that
the will conferred upon them the power so to do, proceeded to
sell the land devised to the widow for life, for the purpose of
making a division thereof, as directed by the will, and this sale,
by the consent of all parties concerned, has been confirmed by
an order in this cause, in which all the equities are reserved and
transferred from the land to the fund arising from the sale. Soon
after this sale was made by the executors, to wit, on December
7, 1885, Augustus M. Roundtree assigned to the defendant,
Weathersbee, all his right, title, and interest in that portion of
the estate of his father, which was given to his mother for life,
and directed the executors to pay over said interest to said

Weathersbee. A copy of this assignment is set out in the "Case," from which it appears that though the attesting clause seems to have been written with the intention of its being under seal—"Witness my hand and seal"—yet there is no seal placed opposite the name of the assignor, and there is but one subscribing witness.

The main object of this action, which was commenced on December 23, 1885, is to obtain the decree of the court as to the proper construction of the first clause of the will of the said William Roundtree, as well as to determine the conflicting claims of the heirs of Dicks, and the defendant, Weathersbee, to the interest of Augustus.

Without undertaking to give even an abstract of the elaborate reasoning which conducted the Circuit Judge to the conclusions which he adopted, his whole decree being set out in the "Case," it is sufficient to state here the conclusions of law which he reached to which error is imputed by the several grounds of appeal : 1st. He concluded that the children of James W. Roundtree, as a class, were entitled to the share in the remainder, to which their father would have been entitled if he had survived the testator. 2d. That the heirs of Mrs. Meyer were also entitled to the share of the remainder to which she would have been entitled. 3d. That the heirs of Dicks were entitled to the interest of Augustus M. Roundtree under the sheriff's deed.

From this decree the defendants, Weathersbee and Augustus M. Roundtree, appeal upon the several grounds set out in the record, which need not be more specifically stated at this stage of the opinion, as the controlling propositions of law upon which these grounds rest will be hereinafter stated and considered. The heirs of Dicks, by their appeal, only impute error to the Circuit Judge in his first conclusion above stated, upon grounds which will hereinafter be considered. The children of James W. Roundtree, while not appealing from the decree, give notice, according to the proper practice, that the judgment should be sustained upon an additional ground to those upon which it is rested by the Circuit Judge, to wit: "That it appears from the 4th clause of the will that the testator intended, should any of his

children die in his life-time leaving issue, such issue were to be substituted for and take instead of such child dying."

It should have been stated before, perhaps, that no question is made as to the personal property given to the widow for life, for the reason, probably, suggested by the Circuit Judge, that it is not likely that "any of it has survived the wear and tear of twenty-five years' use, and the wreck of Sherman's march through that section in the early part of the year 1865." At all events, the controversy here is, as we understand it, confined to the land, or rather the proceeds of the sale thereof.

It seems to us that the controlling question is as to what the testator meant by the terms "my surviving children," as used in the first clause of the will. To determine this question, we must ascertain what period must be looked to with a view to discover who would then be the surviving children of the testator. But three periods have been, or can be, suggested for this purpose: 1st, the date of the will; 2d, the death of the testator; 3d, the death of the life-tenant, the widow. The first idea which naturally presents itself is, that if the testator, when he used the words in question, had reference to either the 1st or 2d periods above suggested, then the use of the word "surviving" was wholly unnecessary. For it is quite clear that if it was the intention of the testator that the remainder should be divided amongst his children who were living at the time of the execution of the will, or at the time of his death (the period when a will is ordinarily supposed to speak), the words "my children" would mean precisely the same persons as the words "my surviving children."

For, suppose it be assumed, or proved to a demonstration, that the testator, when penning his will, intended that all of his children who were *then* living should share in this remainder, and he had used in the clause the words "my children," instead of the words "my surviving children," is it not clear that the words "my children" would just as perfectly have designated the persons whom we have supposed he intended should take, as if he had used the words "my surviving children"? In fact, more so, for the interpolation of the word "surviving" would have tended to raise a doubt about what was perfectly clear before. So, too, if we should assume that the testator intended that all of his children

who were living at the time of his death should share in this remainder, such intention would have been quite as fully and much more clearly expressed by the use of the words "my children," than by the words "my surviving children"; for it cannot be questioned that when a testator directs that certain property shall be divided amongst "my children," all those who can bring themselves into that class at the time of the testator's death, are entitled to share in such division; and when the word "surviving" is interpolated, it is not only wholly unnecessary under the supposition we have made, but rather tends to obscure that which was before perfectly clear.

Another objection to the adoption of the period first suggested—the date of the will—is that if that was the period in the mind of the testator, he would most naturally have described those who were to take by their names, which, of course, were known to him, or at least as those who were then living, and would not have used what, to say the least of it, was a very doubtful expression, as is shown by the very numerous cases in which the courts have been called upon to construe the meaning and effect of the words "survivors" and "surviving."

It seems to us clear, therefore, that if we should adopt either the first or second period suggested as the point to which the testator's mind was directed while penning the first clause of his will, we must necessarily regard the word "surviving" as mere surplusage, adding nothing to the language used, and throwing no light whatever on the intention which the language was used to express. This, however, we are not at liberty to do, as the well settled rule requires us to give force and effect to every word used; and it would be very extraordinary to reject so important, and oftentimes controlling, a word as that of "surviving" as surplusage. The testator did use the word, and manifestly used it as qualifying the word "children," and we must give it that effect. By its use he plainly intended that the residue of his estate, after the termination of the widow's life-estate, should be divided—not amongst his children, for he did not say so—but amongst his *surviving* children, for that is what he has said. He, therefore, clearly did not mean to include *all* of his children, but only his *surviving* children. He could not possibly know which of his

children would be then living, and therefore used the most appropriate word to designate those whom he could not otherwise describe. His mind was directed to the division of that portion of his estate which, according to his scheme, could not possibly take place until some future, indefinite period, and while his mind was so directed to that period he uses the terms in question—"my surviving children"—and the inference seems irresistible that he meant by those terms, those of his children who might be then surviving.

There is nothing whatever to show that, after the testator's mind was thus thrown forward to a future and indefinite time, for the purpose of directing what was to be done with his property at that time, it reverted back to the condition of things existing at the time he executed his will, or at the time of his death, for the purpose of designating the persons who were to share in such future division. If he had so reverted, then it would have been most natural for him to say that such division should be made amongst "my children," naming them, or simply amongst "my children." On the contrary, however, his intention being that this division which was to be made at a future, unascertained period, not amongst all of his children, as is conclusively shown by the qualifying word "surviving," and not being able to more specifically designate the objects of his bounty in such division, he employs the words found in the will, which we construe to mean children surviving at the time fixed for the division. This view is fully supported by the authorities. Indeed, it is conceded to be the general rule in this State that where a testator gives property to one for life, with remainder to be equally divided amongst his surviving children, the death of the life-tenant, and not that of the testator, is the period which must be looked to in order to determine who are to take. *Evans* v. *Godbold*, 6 *Rich. Eq.*, 26; *Schoppert* v. *Gillam, Ibid.*, 83.

But it is contended that while this is the general rule, it is subject to exceptions; that the intention of the testator must govern, and where it is ascertained that the testator intended otherwise, then the rule cannot be applied. This is undoubtedly true; for the object of all construction is to ascertain the intention of the testator, and when that is ascertained it must be carried into

effect, provided this can be done consistently with the settled rules of law. But how is the intention to be ascertained? Certainly not by conjecture as to what the testator ought to have done, but by considering what is the plain meaning of the language which he has used, and by giving a careful consideration to the words of the will as a whole, guided by such rules of law as experience has shown to be useful in seeking such intention. We are to read the will as a whole, and *from its terms* ascertain, if practicable, what was in the mind of the testator at the time he executed it. We may also, where the language used is obscure or doubtful, read such language in the light which may be reflected upon it by the circumstances surrounding the testator at the time he executed his will, but such circumstances cannot be resorted to to prove the testator's intention apart from his language. *Rosborough* v. *Hemphill*, 5 *Rich. Eq.*, 95. Now, reading this will in the light of these principles, we are unable to discover anything in the terms of the will, even when read in the light of the surrounding circumstances, which indicates that this should be an exception to the general rule. The circumstance principally relied upon for the purpose is the fact that the testator, at the time he made his will, had lost four of his children, and that there were seven then surviving; but we suppose that this circumstance presents itself in many, if not in most, instances, and yet we have not been able to find any case where such a circumstance has been held sufficient to take the case from under the operation of the general rule.

Again, it is urged that the testator, by using the words "my surviving children" in the fourth clause of his will in a different sense from that which we have attributed to them, under the operation of the rule as settled by the cases of *Evans* v. *Godbold* and *Schoppert* v. *Gillam*, *supra*, has thereby indicated an intention that they should be understood in the same sense wherever they are found in the will, upon the principle that it is to be presumed that the same word is used in the same sense wherever it occurs in the same will. But this principle must necessarily be qualified by the connection in which the word is used, because it does not follow, either logically or grammatically, that because a word is used *in one connection* in a certain ascertained sense,

that the same sense is to be attributed to it when used *in some other connection* in the same written instrument. Now, while it is perfectly certain that the terms, "my surviving children," in the connection in which it is used in the second paragraph of the 4th clause of the will, mean children surviving the testator, it does not by any means follow that the same words are used in the same sense in the first clause, where it is used in a different connection. In the 4th clause it is used in connection with a direct gift to the children, to take effect immediately upon the death of the testator, and there is no other period to which survivorship can be referred, except that of the death of the testator ; but in the first clause these words are used in another connection altogether, in reference to a gift preceded by a life-estate, which is not to take effect until after the termination of such life-estate.

This marks the distinction between the two clauses, for, as is said in 2 *Jarm. Wills*, 462 (Perkins edition): "In this state of the recent authorities, one scarcely need hesitate to affirm that the rule which reads a gift to survivors, simply as applying to objects living at the death of the testator, is confined to those cases in which there is no other period to which survivorship can be referred; and that where such gift is preceded by a life or other prior interest, it takes effect in favor of those who survive the period of distribution, and of those only." It is true that the learned author calls attention to the fact that some of the cases forbid the application of this rule to devises, although, he says, "It is difficult to discover any ground for making them the subject of a different rule," and he evidently does not think that such a distinction is well founded. See, also, what is said by Simpson, C. J., in *Mendenhall* v. *Mower* (16 *S. C.*, 303), as to the distinction which formerly existed between real and personal property, and the rules applicable in construing instruments by which they are transferred and conveyed.

The words "my surviving children" are used in five different places in the will, and in every instance, except that presented by the second paragraph of the 4th clause, which directs distribution of the residue, "immediately after my death," they are not only susceptible of the construction which we have placed upon them,

but such a construction is required by the rule; for in every instance, except that one, they are used in connection with a prior gift to some one, and the gift to the surviving children is only to take effect upon the termination of such prior estate. It seems to us that it would be a very unsafe rule of construction to hold that, because in one instance out of five the words, "my surviving children," apply to children living at the death of the testator, those words when used in four other places, in connection with different matters, must be held to mean the same thing; especially when the controlling word, "surviving," was in that instance wholly unnecessary—a mere pleonasm. For, as we have seen, if the testator had, in the second paragraph of the 4th clause of his will, directed that the residue should be divided, "immediately after my death," amongst my children, instead of "my surviving children," the effect would have been the same that it now is, and all of his children living at the time of his death would have been entitled to share in such division, the only effect of the introduction of the word "surviving" being rather to obscure than to make clear his intention.

Again, it is urged by the counsel for the heirs of Mrs. Meyer, that there was no devise of any *estate* to the widow at all, but that she was merely given *the use* of the property, while the estate therein immediately passed to the children, and, therefore, this case does not come within the rule as there was no prior gift of the property to the widow. We agree with the Circuit Judge, however, that the devise to the widow was a complete disposition of the property for the time being—the life of the widow—and invested her with a life-estate therein, "unaffected by the seeming limitation implied by the terms, '*for her own use*,' which, manifestly, only refers to the amount and quality of the stock, plantation tools, and furniture which she might need in operating the farm and keeping up the establishment as he left it at his death." This is clear from the language used, as he does not give the widow *all*, or any specified portion, of the stock, but "as much of the stock, &c., as she may want for her own use during her natural life;" which shows beyond dispute that the words, "for her own use," were introduced, not for the purpose of limiting her inter-

est in the property, but solely for the purpose of indicating how much of the stock, &c., she was to take.

Again, it is urged that the children of James W. Roundtree should be let in upon the ground of mistake. It is not necessary for us to consider whether the Court of Equity has jurisdiction to correct mistakes in wills, and if so, in what cases, for we do not think any case of mistake was presented. It is true that James W. Roundtree was alive at the time of the execution of the will, and was one of the objects of the intended bounty of the testator, but it does not necessarily follow that his children were—certainly not that they were *equal* objects of his bounty. On the contrary, there is nothing in the will to show that the testator intended to place any of his grandchildren upon an equal footing with his children, but the will rather shows the reverse whenever any of his grandchildren are alluded to. It is likewise true that James W. Roundtree pre-deceased the testator but by a very few days, though the fact does appear to have been known to him before his own death. Whether he had time, opportunity, or ability to alter his will, or whether he even expressed any wish to do so, does not appear. The Circuit Judge seems to assume, but upon what evidence, if any, the record does not disclose, that "the testator was kept in ignorance of his (James's) death until so near his own that it was probably impossible to alter his will."

Now, even accepting this assumption as well founded, it certainly does not show a case of mistake, but rather that of misfortune or omission. Can any one venture to say what the testator desired to do with the interest which he had intended for his dead son, and which he could not take by reason of his death? If the court should undertake to do so, would not that be a clear case of undertaking to *make*, instead of construing, the will of a testator? It may be possible, and perhaps not altogether unlikely, that the testator supposed, after he was informed of the death of his son, James, that under the provisions of the act of 1789 his children would take what was given to him by the will, and, therefore, that it was unnecessary to make any alteration in his will. But even if this were so, this, clearly, was not such a mistake of law as the court would relieve from (if, indeed, there is now any case in which relief would be granted upon that

ground. *Cuningham* v. *Cuningham*, 20 *S. C.*, 317) ; for it was nothing more than an erroneous construction of a statute (*Pratt* v. *McGhee*, 17 *S. C.*, 428), which certainly affords no ground of relief.

That the children of James cannot take by substitution is, we think, satisfactorily shown by the Circuit Judge in his decree, and we need not repeat here what he has there said. But the counsel for these children earnestly urges, in his argument here, their claim to take by substitution upon the ground that the fourth paragraph of the 4th clause of the will implies that the testator intended that the children of a deceased child should take by substitution. The language of that paragraph is as follows: "And finally, it is my will and desire, that if any of my children should die leaving no issue, the property they receive from my estate shall revert back and be equally divided between my surviving children." His argument, in brief, is that inasmuch as there is no express provision in this clause for the issue of a deceased child, while provision is expressly made for the disposition of the share of a child who may die without issue, the necessary implication is that the testator intended that, in the case not expressly provided for—the case of a child dying leaving issue—such issue should take by substitution for the parent. But it is manifest that this proposition is based upon an assumption, which we have seen is without foundation, to wit, that James, the parent of these children, was one of those embraced within the terms—"my surviving children"—used in the 1st clause, and, therefore, one of those who would have been entitled to share in the remainder after the termination of the widow's life estate.

Indeed, the language of the paragraph last quoted affords conclusive proof that the terms—"my surviving children"—as there used cannot mean children surviving either at the date of the will or at the time of the death of the testator, but must refer only to those who are surviving at the time the gift over takes effect. Otherwise, a strange anomaly would be presented. For if a child who survived the date of the will, under the one supposition, or the death of the testator, under the other, and then died leaving no issue, his share would be divisible, not alone amongst his then surviving brothers and sisters, but his own estate would

be entitled to an equal share in such division, for he was one of the children surviving at the date of the will, under one supposition, and at the time of testator's death, under the other, and therefore his estate would be entitled to share equally with the other surviving children in the division *of his own share.* So that if it had happened that at the date of the will, as well as at the time of testator's death, there were only two surviving children, and one of them should afterwards die leaving no issue, the share of the one so dying would not go to the remaining child, but such share would be equally divided between such remaining child and the estate of the other. It is very manifest that such could not have been the intention of the testator, but, on the contrary, that his intention was, in accordance with what we have seen to be the rule in such cases, that in the case supposed the share of the child dying without issue should go to the child or children who might be *then* surviving, and not to those who may have been surviving either at the date of the will or at the death of the testator.

The next material inquiry is as to the nature of the estates in remainder given to the surviving children by the 1st clause of the will—whether they are vested or contingent. It seems to us clear that they were contingent, for, having reached the conclusion that the words, surviving children, as used in that clause, mean only the children who were alive at the time of the death of the life-tenant, it is very manifest that, until that event occurred, it was wholly uncertain who the persons entitled to take would be, and this brings the case directly within the definition of a contingent remainder. Nothing is given to any child except one who survives the life-tenant, and therefore until that event occurred no one of the children could claim that he had any right to any interest in the property, the enjoyment of which in possession was postponed; for his right, as well as his enjoyment in possession, depended upon a future contingency. But without pursuing the discussion it is sufficient to cite the cases of *Faber* v. *Police,* 10 *S. C.,* 376, and *McElwee* v. *Wheeler, Ibid.,* 392, as well as those cited by counsel.

It follows from this that the interest of Augustus M. Roundtree, as one of the surviving children of the testator, in the re-

mainder after the termination of the life estate of the widow, being a contingent remainder, was not subject to levy and sale under execution, but was capable of being assigned. *Allston* v. *Bank*, 2 *Hill Ch.*, 235. Hence the heirs of Dicks can take nothing under the sheriff's sale to their ancestor, such sale having been made, as we understand it, prior to the happening of the event—the death of the life-tenant—upon which the remainder created by the 1st clause in the will became vested, and the defendant Weathersbee's claim to the interest of Augustus, under his assignment, is superior to that of the heirs of Dicks, who claim under the sheriff's deed. Whether the lien of the judgments against Augustus did not attach to his interest in the remainder as soon as the same became vested by the death of the life-tenant, and thereby became superior to the claim of Weathersbee under his assignment, which was not executed until after the interest in remainder became vested, is a question not now before us. It does not appear from the record who those judgment creditors were, and they not being parties to this proceeding, their rights, if they have any, cannot now be considered or adjudicated.

It is contended, however, in behalf of the heirs of Mrs. Meyer that even assuming that the remainder was contingent, yet still it was transmissible. Under the view which we have taken as to the period which must be looked to for the purpose of ascertaining who are the persons entitled in remainder, we do not see how this question can arise. But we may say that while it is true that there is a certain class of contingent remainders which may become transmissible by the happening of the event, even after the death of the remainderman, yet this case could not be brought into that class. The rule, as we understand it, is this: where *the person* to take in remainder is ascertained, and it is only *the event* upon which such person is to take that is uncertain, there the estate in remainder becomes transmissible to the heirs of the remainderman, upon the happening of the event upon which such ascertained person was to take, even though such event may not happen until after the death of the person named, or otherwise sufficiently designated, as remainderman. But where *the person* to take is uncertain, then the estate cannot become transmissible

until the estate becomes vested by the happening of the contingency.

As is said in *Dickson* v. *Dickson*, 23 *S. C.*, at page 225 : "It appears somewhat anomalous that a contingent remainder, which never, in fact, vests in the remainderman during his life, should yet be transmissible to his representatives. But that there are such contingent remainders is well settled. There are several kinds of contingent remainders classified by the character of the contingency upon which they are based. Mr. Fearne divides them into four classes. It is not necessary, however, to discuss all of these. It is sufficient for our present purpose to say that where the existence of the remainderman himself at the time of the event upon which the remainder is to take effect, does not constitute the contingency, then the remainder is transmissible. A testator may make it one of the conditions of the limitation that the remainderman shall survive the first taker; but where he fails to do this, and places the remainder upon some other event or contingency, wholly disconnected from the survivorship of the remainderman, the fact of his non-survivorship will not defeat the remainder, for the obvious reason that the testator has not so declared and directed"—citing *McMeekin* v. *Brummet*, 2 *Hill Ch.*, 642; *Pritchett* v. *Cannon*, 10 *Rich. Eq.*, 394; and *Fearne on Remainders*, 559, 560. Now, in the case under consideration the testator has, as we have seen, made it "one of the conditions of the limitation that the remainderman shall survive the first taker," and therefore the remainders are not only contingent, but they are of such a class of contingent remainders as are not transmissible.

It only remains for us to consider some of the cases mainly relied on by counsel as being opposed to the views which we have adopted, for the purpose of showing that they do not apply to the case now under consideration. In *Drayton* v. *Drayton* (1 *De-Saus.*, 324), there were two provisions in the will of testator for his youngest son, John. By the first the limitation over was expressed substantially as follows: that in case of the death of John under age and without issue, the property should be sold and the money equally divided among "his four surviving sons, William Henry, Charles, Glen, and Thomas, or the survivors of

them ;" and in the other the provision was that in the event men-
tioned the property "should be divided equally among his sur-
viving brothers." Upon the death of John under age and with-
out issue the question was, whether the children of William Hen-
ry, who had survived the testator, but had died before John,
should be let in, and the court held that they should, mainly
upon the ground that those who were to take in remainder were,
in the first instance, designated *by name*.

We adopt the comments made upon this case by Nott, J., in
*Swinton* v. *Legaré*, 2 *McCord*, 444: "The principal ground of
decision was, because the legacy was given to the four surviving
sons by name ; and although in the last bequest the testator made
use of the words surviving brothers, without naming them, yet
as the intention appeared to be the same, the court gave it the
same construction, intimating thereby that if both clauses had
mentioned the surviving brothers, without any specification of
their names, the construction would have been otherwise." It
is true that Harper, Ch., in his Circuit decree in *Anderson* v.
*Smoot* (*Speer Eq.*, 312), seemed disposed to give more force to
the case of *Drayton* v. *Drayton* than is attributed to it in *Swin-
ton* v. *Legaré*, but it will be observed that the Court of Appeals
did not adopt Chancellor Harper's view and rested their decision
upon another ground. It seems to us, therefore, that there is a
wide difference between the case of *Drayton* v. *Drayton* and this
case.

The case of *Bankhead* v. *Carlisle* (1 *Hill*, 357) differs mate-
rially from the case under consideration, for there the limitation
over after the death of the life-tenant was that the property
should "be equally divided amongst my children as above named."
There was no limitation over to survivors, and more than that,
the remainderman who survived the testator but predeceased the
life-tenant was designated *by name*, and his representatives were,
of course, entitled to share in the division which was to be made
on the death of the life-tenant. So, too, in the case of *Britton* v.
*Johnson* (2 *Hill Ch.*, 430), the limitation over was not to survi-
vors or surviving children, but to "my children and or their heirs,"
a rather awkward expression, which the court construed to mean
to the testator's children and the heirs of any deceased child.

So also in *Bentley* v. *Long* (1 *Strob. Eq.*, 43), the limitation over after the death of the widow was to "our children"—not to surviving children—and it was held that each child living at the time of the death of the testator took a vested transmissible interest. In *McCreary* v. *Burns* (17 *S. C.*, 45), the limitation over, though not very clearly expressed, was construed practically to amount to the same thing as in the preceding case, and the same result followed. But it is sufficient for our purpose to call attention to the fact that there was no limitation to survivors.

We are unable, therefore, to see that these, or any of the other cases cited, are in conflict with the views which we have adopted.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the case be remanded to that court for such further proceedings as may be necessary to carry out the views herein announced.